**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                           No. CR 05-2452 MV

CARLOS CHAVEZ

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Sentencing Memorandum, Objections to the Pre-Sentence Report and Request for Downward Departure, filed May 9, 2006 **[Doc. No. 25]**. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at Defendant's sentencing hearing that the Federal Sentencing Guidelines ("Guidelines") range in the present case is greater than necessary to satisfy the purposes of sentencing and that a downward variance is justified pursuant to *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). The Court now sets forth the basis for its prior ruling in this Memorandum Opinion.

**BACKGROUND**

Defendant was arrested for possession with intent to distribute methamphetamine while in possession of a gun. The investigation leading to Defendant's arrest began when law enforcement officers received information that individuals residing at County Road 4990, Trailer #351, in Bloomfield, New Mexico ("Address #351"), were involved in illegal drug activities. On October 26, 2005, a police officer, acting in an undercover capacity, and a cooperating source ("CS") went to Address #351. Previously, the CS stated that Carlos Chavez was the CS's source of methamphetamine and that he was known to distribute methamphetamine in the Farmington, New

Mexico area. Once at Address #351, the CS exited the undercover vehicle and walked up to the front door of the trailer and entered the residence. A short time later, the CS exited the trailer and returned to the undercover vehicle. The CS told the undercover officer that the trailer occupant, identified as Defendant, would allow the undercover officer to enter the trailer so that they could negotiate a methamphetamine transaction. The undercover officer refused the offer, stating it would be best if Defendant came outside. The CS went back inside the trailer and then returned to the undercover vehicle at which time he gave the undercover officer a clear plastic baggie which contained approximately 15 grams (less than one ounce) of suspected methamphetamine. The CS reported that Defendant had more methamphetamine inside the trailer and wanted the undercover officer to enter the trailer to discuss the details of the methamphetamine purchase. The undercover officer directed the CS to tell Defendant he would not enter the residence.

 The CS entered the trailer a third time and, on his return to the undercover vehicle, told the undercover officer that Defendant would soon be exiting the trailer. A short time later, Carlos Chavez walked out of the residence, approached the undercover vehicle, and engaged in a conversation with the undercover officer. In response to the undercover officer's inquiry, Defendant stated that an ounce of methamphetamine would sell for $800.00. As they were talking, the undercover officer observed Defendant place his hand on the outside of his shirt as if he was holding something. The officer asked Defendant if the bulge under his shirt was the methamphetamine and Defendant responded that it was. During the conversation the undercover officer told Defendant that the money was in the trunk of his vehicle. As they walked toward the back of the vehicle, a team of arresting officers arrived and took Defendant into custody. During a pat down search, Defendant was found to possess approximately 147 grams of methamphetamine, which was separated into five clear

plastic baggies. The Defendant also possessed a loaded Colt .45 automatic, Model 1911 handgun, which had seven rounds in the magazine.

A search of the trailer at Address #351 revealed, among other things, a glass jar that contained suspected methamphetamine, a black digital scale located on the living room couch and an FIE .22 revolver located in a master bedroom closet. Laboratory reports from the Drug Enforcement Agency reflected that Defendant sold the undercover officer 135.0 net grams of actual methamphetamine which had a purity of 90 percent. The methamphetamine located inside the glass jar weighed 102.3 net grams of actual methamphetamine and it had a purity of 75 per cent. Defendant is held accountable for a combined total of 237.3 net grams of actual methamphetamine.

Defendant related that this was the first time he had been "fronted" with a full pound of methamphetamine. According to him, he obtained the methamphetamine for $600 per ounce and he sold it for $1,000 per ounce. Defendant further advised that he only sold methamphetamine to two specific individuals who then distributed the drug in the Farmington, New Mexico area.

In an oral statement during a presentence interview conducted on March 1, 2006, Defendant stated:

> I had a quantity of methamphetamine and a firearm. Other individuals told me to take care of the methamphetamine. This was the first time that I had actually sold the drug. I did not receive any money, however, I was told that I would get paid. I fear for my safety because of my arrest and because the other people who told me to take care of the methamphetamine will think that I identified them.

After his arrest, Defendant proceeded to cooperate with authorities by providing law enforcement officers with information regarding the drug trafficking activities of four other individuals. Defendant related that one of the individuals, who resides in Chihuahua, Mexico, transported methamphetamine from Ciudad Juarez, Chihuahua, Mexico into the United States on an average of once per month. Defendant stated that this individual usually transports between ten and

3

fifteen pounds of methamphetamine, which is secreted inside spare tires and shipped to Farmington, New Mexico, where it is distributed.

On November 10, 2005, a two-count Indictment was filed **[Doc. No. 8]** that charged Defendant with possession with intent to distribute 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924 (c)(1)(A)(i). Both counts of the Indictment carried a mandatory minimum of five years imprisonment. On February 22, 2006, Defendant entered a guilty plea as to the Indictment, pursuant to a plea agreement.

Probation disclosed a Pre-Sentence Investigative Report ("PSR") that assigns Defendant a base offense level of 34. Crediting Defendant with a 3-level adjustment for acceptance of responsibility, the PSR's calculation of Defendant's total offense level is 31. The PSR assessed 0 criminal history points against Defendant, which establishes a criminal history category of I. This results in a Guidelines range of 108 to 135 months. As to Count II of the Indictment, the PSR assigns a statutorily required 5 year term of imprisonment, to be served consecutive to the term imposed for Count I. The total time, under the Guidelines, would be 168 to 195 months.

Defendant, in his sentencing memorandum, argued that he should only be sentenced to the mandatory minimum, rather than the suggested Guidelines sentence. As the basis for this sentence he argued that he should be granted downward departures under a variety of different Guidelines sections. He also argued that a downward variance was appropriate under *Booker*.

## DISCUSSION

In *Booker*, the Supreme Court held that the Federal Sentencing Guidelines violated the Sixth Amendment. To remedy the constitutional problem, the Court excised 18 U.S.C. § 3553(b)(1), the provision of the Sentencing Reform Act that made the Guidelines mandatory, along with the appellate

4

review provisions of 18 U.S.C. § 3742(e) and any cross-references to section § 3553(b)(1). Under the new advisory Guidelines scheme, "district courts have a freer hand in determining sentences." *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005). Thus, "while the Guidelines still exert gravitational pull on all sentencing decisions ... district courts now have more discretion to tailor sentences to the individual circumstances of a defendant." *Id*. Further, the sentencing factors set forth in § 3553(a), "which the mandatory application of the Guidelines made dormant, have a new vitality in channeling the exercise of sentencing discretion." *Id*.

In all cases, to determine a reasonable sentence, this Court will determine the appropriate advisory Guidelines range examining departure arguments and factual objections to the Presentence Report ("PSR") and analyze whether, under *Booker*, a sentence outside of the advisory Guidelines range is reasonable.

**I.      Advisory Guidelines Range**

As previously set forth, the PSR calculates a Guidelines range of 168 to 195 months imprisonment.

**II.     Departure Issues**

Defendant raises numerous departure issues. I address each below.

**A.      Downward Departure for Minor Role**

Defendant argues that he is entitled to a downward departure of two-levels because he was a "minor participant" in the offense. U.S.S.G. §3B1.2 provides in relevant part:

Based on the defendant's role in the offense, decrease the offense level as follows:

(b)     If the defendant was a minor participant in any criminal activity, decrease by

**2** levels.

5

Application Note 3(C) provides:

> The determination whether to apply . . . subsection (b) . . . involves determination that is heavily dependent upon the facts of the particular case. As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted.

Application Note 5 provides that subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants, but whose role could not be described as minimal. Application Note 3(A) provides in relevant part: "This section provides a range of adjustments for a defendant who plays a role in committing the offense that makes him substantially less culpable than the average participant."

In support, Defendant states that he "never made more than three sales before he was arrested in this case, and had never been 'fronted' methamphetamine prior to this incident. More important, subsequent investigation has revealed that there are other, more actively involved participants in the methamphetamine distribution ring." Def's Mem. 10. This Court finds that Defendant was more than a minor participant in the drug trafficking in which he was engaged. He had at least two people below him on the drug distribution chain, as evidenced by his statement on the date of his arrest, when he told law enforcement officers that "he only sold methamphetamine to two specific individuals and they then distributed the drug." PSR at 5. Also, although he claimed that this "was the very first time" that he had ever sold the drug during the presentence interview conducted on March 1, 2006, he later admitted to selling methamphetamine at least two to three times before his arrest. Def.'s Mem. 5. Also, the large quantity of drugs, its high purity (90% and 75%), and the presence of an electric scale and two firearms is convincing evidence of an operation that is not associated with merely being a minor participant.

6

Moreover, although Defendant contends that subsequent investigation revealed that there were other, more actively involved participants in the methamphetamine distribution, no evidence ever came to light to corroborate this assertion. PSR Add. 2.

Under these circumstances, I find that Defendant is not entitled to a minor participant reduction.

**B.     Youth**

Defendant argues that a departure is warranted based on his youth as Defendant had only recently turned eighteen at the time of the offense.

Section 5H1.1 of the Guidelines states:

> Age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. Physical condition, which may be related to age, is addressed at §5H1.4.

The Tenth Circuit has interpreted this section to mean that age is a discouraged factor and, therefore, a district court may "rel[y] on [this] factor[] only if [it is] present to an exceptional degree or in some other way made the case different from the ordinary case where the factor[ is] present." *United States v. Collins*, 122 F.2d 1297, 1306 (10th Cir. 1997).

Because the consideration of youth is a discouraged departure factor, I find that this factor is more appropriately considered under a *Booker* analysis and deny a departure on this basis.

**C.     Limited Educational and Vocational Skills**

Section 5H1.2 of the Guidelines states:

> Education and vocational skills are not ordinarily relevant in determining whether a departure is warranted, but the extent to which a defendant may have misused special training or education to facilitate criminal activity is an express guideline factor.

7

>Education and vocational skills may be relevant in determining the conditions of probation or supervised release for rehabilitative purposes, for public protection by restricting activities that allow for the utilization of a certain skill, or in determining the appropriate type of community service.

Under Tenth Circuit law, this is a "permissible departure factor[] only in extraordinary cases, i.e., when the court finds [it is] present in some unusual or exceptional way." *United States v. Alvarez-Pineda*, 258 F.3d 1230, 1240 (10th Cir. 2001).

The Defendant completed eight years of education in Mexico. While Defendant's education is limited, it is as good as, if not better than, the education of many of the defendants that come before this Court. In other words, Defendant's circumstances are not so extraordinary that a departure is warranted on this basis. However, this factor shall be considered under this Court's *Booker* analysis.

### D.  Mental and Emotional Conditions

U.S.S.G. §5H1.3 provides that "mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)." A sentencing court may consider mental and emotional conditions if such conditions are "present to an unusual degree and distinguish[] the case from the 'heartland' cases covered by the guidelines in a way that is important to the purposes of sentencing." *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (citing U.S.S.G. §5K2.0).

Defendant presents no facts to support a departure on this basis. In fact, at the time of his presentence interview he reported that he was in good mental and emotional health. Therefore, a departure on this basis is denied.

### E. Aberrant Behavior

Defendant argues that he is entitled to a downward departure for aberrant behavior under U.S.S.G. § 5K2.20 (emphasis added), which provides:

> A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. However, the court may not depart below the guideline range on this basis if (1) the offense involved serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) **the instant offense of conviction is a serious drug trafficking** offense; (4) the defendant has more than one criminal history point . . . or (5) the defendant has a prior federal, or state, felony conviction, regardless of whether the conviction is countable under Chapter Four.

According to 5K2.20, Application Note 1., a "'serious drug trafficking offense' means any controlled substance offense under title 21, United States Code, other than simple possession under 21 U.S.C. § 844, that provides a mandatory minimum term of five years or greater." Because the Defendant has committed a "serious drug trafficking offense," a departure under this section is not warranted and is denied.

### F. Family Ties and Responsibilities

Defendant seeks a downward departure due to family ties and responsibilities. Family circumstances is a discouraged factor in granting a downward departure (U.S.S.G. § 5H1.6); thus, the circumstances must be exceptional and extraordinary. Defendant has not set forth any family ties and responsibilities that would mitigate on his behalf. Although Defendant does have children in Mexico, the PSR indicates that he only provides limited support to them. Therefore, this Court denies a departure on this basis.

### G. Lack of Guidance as a Youth

Section 5H1.12 states that "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."

9

Defendant, again, has not explained why his circumstances are so extraordinary that his lack of guidance as a youth should mitigate his sentence. In fact, the PSR states that "The defendant and his sister described their family as economically poor, yet their father was able to provide for the family's basic necessities" and "[t]hey continue to be a close knit family." PSR 10. Also, the Defendant reported no family history of substance abuse, arrests, physical abuse or sexual abuse.

### H.     Physical Condition, Including His Drug and Alcohol Dependence or Abuse

Defendant references his physical conditions, including his drug and alcohol dependence as a possible basis for departure.

Section 5H1.4 of the Guidelines states:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.
> Drug or alcohol dependence or abuse is not a reason for a downward departure. Substance abuse is highly correlated to an increased propensity to commit crime. Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program (see § 5D1.3(d)(4)). If participation in a substance abuse program is required, the length of supervised release should take into account the length of time necessary for the supervisory body to judge the success of the program.

Clearly, drug and alcohol abuse is a discouraged factor for departure under the Guidelines. While Defendant does indicate that he has had some substance abuse problems in the past, he does not even try to explain why his substance abuse warrants a departure in this case. Moreover, he has made no argument that any other physical characteristic is present to a degree that would justify a departure. Therefore, a departure on this basis is denied.

**I.      Diminished Capacity**

Defendant also makes a casual reference to diminished capacity as a possible departure basis. Section 5K2.13 of the Guidelines (emphasis added) provides the following policy statement:

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) **the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants**; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Application Note 1 to §5K2.13 provides that, for purposes of this policy statement, "'significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."

Diminished capacity is an "encouraged" factor – a specific factor provided by the Commission "to aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines." *United States v. Neal*, 249 F.3d 1251, 1256 (10th Cir. 2001) (citing U.S.S.G. §5K2.0). In the case of an encouraged factor, "the court is authorized to depart if the applicable Guideline does not already take it into account." *Id.*

Although this is an "encouraged factor", there is absolutely no evidence to suggest that Defendant suffered from diminished capacity at the time of his offense. To the extent his drug use diminished his mental facilities, departure for this reason is expressly prohibited by the Guidelines. Therefore, a departure on this basis is denied.

11

**J.      Adverse Penal Consequences**

Finally, Defendant argues that, under U.S.S.G. § 5H1.10, this Court "may depart downward to eliminate the sentencing disparities created by the adverse penal consequences which befall individuals incarcerated in federal prison who are awaiting deportation." Def.'s Mem. 14. Although deportable aliens are treated differently from United States citizens because they are not eligible for early release programs, Defendant would not have been eligible for early release even if he was a United States citizen because his offense was a felony that involved possession of a firearm. Therefore, a departure on this basis is not warranted.

**K.      Combination of Factors:  Section 5K2.0**

Finally, Defendant argues that the

> cumulative effects of his age, U.S.S.G. § 5H1.1, his lack of sufficient educational, vocational, mental or physical skills, U.S.S.G. § 5H1.2 through 5H1.4, his aberrant behavior, U.S.S.G. § 5K2.20, his diminished capacity, his family ties and responsibilities, U.S.S.G. § 5H1.6; and, the adverse penal consequences which will befall Mr. Chavez based solely on his status as an incarcerated individual awaiting deportation

together justify a departure. Def.'s Mem. 12. The Court has discretion, pursuant to U.S.S.G. §5K2.0, to depart from the applicable sentencing range if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." However, the Tenth Circuit's position is that such a departure should only be granted in "extremely rare" cases. *See United States v. Benally*, 215 F.3d 1068, 1078 (10th Cir. 2000).

After careful consideration of each of these factors individually and as a whole, I find that the circumstances of this case are not so "extremely rare" to warrant a departure on this basis; however, to the extent warranted, these factors will be considered under the *Booker* analysis set forth below.

## II.     *Booker* **Argument**

Defendant argues that the factors set forth in § 3553(a) justify the imposition of the mandatory minimum sentence in this case, instead of the longer sentence suggested by the Guidelines.

### A.     The nature and circumstances of the offense

Defendant pleaded guilty to possession with intent to distribute 292.5 grams of a substance containing a detectable amount of methamphetamine and carrying a firearm during and in relation to that offense. The offense conduct occurred when an undercover police officer and a confidential source approached Defendant and purchased methamphetamine from him.

### B.     History and Characteristics of the Defendant

At the time of his arrest, Defendant had many things going against him in his life; notably, his impoverished childhood, limited education, relative youth and unfortunate history of substance abuse.

His childhood, like many of Mexico's children, was spent within a large family struggling to make ends meet. He was born in Mexico as the sixth of eight children. Growing up, his family struggled to obtain the bare necessities. Defendant left his family home at the age of fifteen, and began his own family with his girlfriend. Their union produced two sons: Guillermo, age three and Carlos, age one. Childhood was cut short for Defendant well before he had obtained the maturity of adulthood.  Along with the demise of his childhood, Defendant's education was truncated after only eight years of education. Instead of spending time in school, Defendant went to work on farms, at a machine shop and on a highway road crew.

In January 2005, Defendant terminated his relationship with the mother of his children. Although he did not maintain contact with her after they parted, he continued to provide for her and their children by periodically sending them money through his eldest brother. A few months after the termination of their relationship, Defendant first entered the United States and moved to Phoenix, Arizona, where he lived in the home of his sister and brother-in-law. In April 2005, at the urging of his brother-in-law, Defendant moved to Farmington, New Mexico, where he lived for the six months prior to his arrest. While living in Farmington, Mr. Chavez was employed helping his brother-in-law buy and sell used automobiles and transport them between Farmington and Phoenix.

Away from his family, Mr. Chavez again began to abuse drugs; specifically, he admits that he smoked methamphetamine between April 2005 to October 2005. Obviously, Defendant was also involved with the trafficking of methamphetamine during this time. Defendant also admits that he had previously used cocaine for about six months when he was sixteen years old.

At the time of his arrest, Defendant had turned eighteen a mere three months earlier. Therefore, despite his youth at the time of offense, he was no longer entitled to the benefit of being treated as a juvenile within the criminal justice system. The Supreme Court has recognized that youthful offenders are entitled to more consideration of factors in mitigation because of their limited and impaired judgment. *See Roper v. Simmons*, 543 U.S. 551 (2005).[1] In *Roper*, the Supreme Court acknowledged that juveniles' "own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." *Id.* at 570. The Supreme Court further opined that "a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than

---

[1] While the Supreme Court recognized that, for many purposes, the age of eighteen is the dividing line between being treated as a child and as an adult, the Court also recognized that this was a categorical rule that is subject to objections. *Id.*

14

in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Id.* at 569 (quotations omitted). The Supreme Court, in recognizing youth as a mitigating factor stated: "the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* at 570 (quotations omitted).

In this case, Defendant was propelled into the adult world well before he had developed the maturity of an adult. His youthful impetuousness and recklessness resulted in an adult conviction for which he now faces a very serious sentence. The difference of three months means that he has been categorically treated as an adult for this offense, without regard for the realities of his lack of maturity at this stage in his life.

### C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

Even without application of the lengthy sentence as suggested by the Guidelines, Defendant's punishment will be harsh since, by statute, he faces a ten-year mandatory minimum sentence. Application of the mandatory minimum in this case will more than adequately reflect the seriousness of the offense and provide just punishment, as it will result in Defendant having spent more than one-third of his life incarcerated by the time he finishes his sentence.

### D. The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant

Apart from the instant offense, Defendant has no criminal history and he has no history of violence. Therefore, protection of the public is of lesser concern to this Court. Moreover, this Court

does not believe that sentencing Defendant to more than ten years imprisonment will have any greater deterrent effect than the ten year mandatory minimum sentence required in this case.

For all of these reasons, after giving serious consideration to the advisory Guidelines, I conclude that the Guidelines range in the present case is greater than necessary to satisfy the purposes of sentencing and that the purposes are better served by application of the statutory mandatory minimum sentence.

## CONCLUSION

At the sentencing hearing on July 13, 2005, this Court found that none of the potential departure basis identified by Defendant were warranted. However, after considering the Sentencing Guidelines, the *Booker* decision, and 18 U.S.C. § 3553(a), the Court sentenced Defendant to the applicable statutory mandatory minimums of 60 months imprisonment as to Count I and 60 months imprisonment as to Count II, said terms to run consecutively. Additional conditions are set forth in the judgment. For the foregoing reasons, and the reasons stated in open court, this sentence is reasonable under all of the circumstances.

This Opinion and Order shall be appended to Defendant's judgment and commitment form filed August 17, 2006 [Doc. No. 34].

It is thereby **ORDERED** that Defendant is sentenced to a total of 120 months imprisonment.

**DATED** this 8th day of November, 2006.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for the United States:
Bill Pflugrath

Attorney for Defendant:
Brian Pori

16